MURRAY BROTHERS COMPANY

*vs.*

AROOSTOOK VALLEY RAILROAD COMPANY.

Aroostook. Opinion September 24, 1912.

*Abandonment of Contract. Contract. Change of Location. Credibility of Witnesses. Charter. Location. Survey. Street Railway. Supplemental agreement.*

1. The plaintiff made a contract in writing with the defendant to construct for it a road bed for a single track railroad from Presque Isle to Washburn. The contract itself was silent as to the precise location of the railroad. The plaintiff claims that the contract was understood to be, and was in reality for a road bed along an approved location, mostly within highway limits. The defendant claims that it was understood to be for a road bed along an intended location through fields, woods and swamps, mostly outside of highway limits. The road bed was in fact constructed along the intended location, outside of the highway. The plaintiff claims that it consented to a modification of the contract, changing the location from the highway to the place where the road bed was constructed in consideration of the defendant's promise to compensate it for the additional expense and difficulty occasioned by the change, and to pay what the labor and materials used in constructing the road bed along the new location were reasonably worth. This suit is brought to recover additional compensation under this alleged promise.

Upon this principal issue in the case, the court is of opinion that the plaintiff has failed to show by a preponderance of the evidence that the original contract was understood to be for a road bed within the highway

limits, or that there was a modification of the contract, or that it is entitled to receive more than the original contract prices, so far as the location is concerned.

2. Some of the timber furnished by the defendant for the plaintiff to use in erecting trestles was unsound and unsuitable, and was on that account more expensive to the plaintiff to work, than would have been the case if the timber had been reasonably sound and clear. The court is of opinion that the plaintiff should be allowed $200 additional, on account of this timber.

3. The plaintiff, a contractor, agreed to do certain work "on force account," the defendant to pay the actual cost, plus ten per cent. In the contract it was provided that the wages of common laborers was not to exceed $2 a day. This is not to be construed as authorizing the plaintiff to pay $2 a day under all circumstances but only so much as was reasonably necessary, and in no event to exceed $2 a day. The defendant complained to the plaintiff that it was paying higher wages than was reasonably necessary. The complaint resulted in the plaintiff's leaving the work, and it now claims that it was discharged. The evidence shows that the defendant was justified in the complaint that was made, and that the plaintiff could not complain, and take it as a breach of contract, if the defendant refused to continue to pay unreasonably high wages.

On report. Judgment for plaintiff.

This is an action of assumpsit and is before the court on report. It involves only a determination of certain disputed questions of fact. The plaintiff, on June 9, 1909, entered into a written contract with the defendant to construct for it the road bed of a railroad. The contract itself was silent as to the location of the proposed railroad on the face of the earth, except that the plaintiff's bid, which was a part of the specifications, stated that it was to be from "Presque Isle to Washburn." The plaintiff claims that prior to making the contract, the proposed location was pointed out to him as being wholly within the limits of the highway leading from Presque Isle to Washburn. This the defendant denied, and claimed that the location of the road was out of the highway, through fields, woods and swamps for practically the entire distance. The road as finally built was along the location claimed by the defendant.

The plaintiff claims that the change in the location was assented to by him in consideration of the promise of the defendant to compensate him for the additional expense occasioned by the change. This suit is brought to recover such additional compensation.

The case is stated in the opinion.

*Louis C. Stearns, Madigan & Madigan, Hersey & Barnes,* for plaintiffs.

*George H. Smith, Charles F. Daggett,* for defendant.

SITTING: WHITEHOUSE, C. J., SAVAGE, SPEAR, CORNISH, KING, HALEY, JJ.

SAVAGE, J. This case comes before the court on report. It involves only a determination of certain disputed questions of fact. The plaintiff, on June 9, 1909, entered into a written contract with the defendant to construct for it the roadbed of a railroad. The contract itself was silent as to the location of the proposed railroad on the face of the earth, except that the plaintiff's bid, which was made a part of the specifications, stated that it was to be from "Presque Isle to Washburn." But the plaintiff claims that prior to the making of the contract the defendant's president, and promotor, Mr. Gould, pointed out to the plaintiff's president, Mr. Charles Murray, and his brother Michael, also connected with the plaintiff company, the proposed location as being wholly within the limits of the highway leading from Presque Isle to Washburn, and that the contract was made with reference to such a location; that after it had begun work at a point on that location, the defendant directed the work to be changed to a new line which was out of the highway, and which if continued would run through fields, woods and swamps, for practically the entire distance; that it thereupon protested against the change for the reason that the proposed location was not the one contemplated by the contract, and that to build a roadbed on this line would be less profitable to it than to build one within the highway limits; that thereupon, and in consideration of the plaintiff's assenting to the change in location, the defendant agreed in effect to compensate the plaintiff for the additional expense and difficulty occasioned by the change, and to pay what the labor and materials used in constructing the roadbed on the new location were reasonably worth, and that under this new agreement, which was an abandonment of the original contract as to prices, the plaintiff continued the work until October 5, 1909, at which time a further change in the contract was agreed to.

The plaintiff brings this action to recover the following amounts in excess of what would have been earned under the original contract prices; for "clearing and close cutting," $394.36; for "grubbing," $571.18; for "common excavation," $17,157.31; for "rock excavation," $16.35; for "erection of timber in culverts," $167.80; for "erection of timber in trestles," $457.48, in all, $18,764.48. The plaintiff also claims damages for being wrongfully discharged and prevented from completing the supplemental contract of October 5, and it is stipulated in the report that if the defendant is liable on this claim, the damages shall be assessed at $1,000. It is admitted that the defendant is indebted to the plaintiff in any event in the sum of $2,136.14, being a balance yet unpaid, for labor reckoned at original contract prices. It may be noted that in the original contract the price for clearing was fixed at $40 an acre; for grubbing at $75 an acre; for common excavation at 30 cents a yard; for rock excavation, $1.35 a yard; for erection of timber in culvert, $5 a thousand, board measure; and for erecting timber in trestles, $10 a thousand, board measure.

The defence, in a word, is that no location within the highway limits was ever pointed out to the plaintiff as the one on which the roadbed was to be constructed, and that the location upon which the roadbed was constructed was the one, and the only one, contemplated by the contract, and was so understood by the defendant's officers at the time the contract was made. And it is denied that the plaintiff was prevented from completing its contract, as it now claims. This states the major issues. But the case is filled up with denials and contradictions, back and forth, as to the circumstances which the parties respectively rely upon in support of their contentions under the major issues. The question resolves itself largely into one of credibility of witnesses.

To illustrate. Mr. Charles Murray, plaintiff's president, testified that he and his brother, since dead, were shown along the whole length of the highway route by Mr. Gould personally, before the contract was made, Mr. Gould denies this, and testifies that instead of going himself with the Murrays, he sent an employee, since dead, with instructions to show them another route, called the Marston survey, substantially the one afterwards built upon. Mr. Gould says that before the contract was made, he showed the

Murrays a blue print profile of the cuts and fills along the Marston survey. Murray denies it. Murray says they were working on the highway location when Gould moved them onto the new line. Gould says the Murrays began on the new line. Murray says that Gould admitted, in effect, that the new location was not the one the contract related to, but that he wanted to build for a freight road, instead of a street railway, and therefore wished to avoid the grades of the hills in the highway, and agreed to "make the price all right." Gould denies that there ever was any such conversation. It seems that about August 1 the defendant's engineer made a certificate of the amount of work then done, and gave it to Murray. In the certificate, the amount then due was reckoned at the original contract prices. Murray says he showed this certificate to Gould, and complained that the prices were not according to the new agreement, and that Gould then admitted that the prices were not carried out right, but said that he would make the prices satisfactory, as soon as he could sell his bonds, that he would pay as much as any other railroad for the same work when he got his bonds floated. Gould says that there was an interview at the time referred to by Murray, but says there was nothing said about prices, and that Murray's only complaint was that the engineer was not giving the plaintiff quantity, or "yardage," enough. In the succeeding months other engineer's certificates were made at the old prices, and delivered to Murray. He says he made similar complaints to Gould, who made similar excuses and promises. Gould denies all this. This labyrinth of assertion and denial might be continued much further, but it is unnecessary. Each of these principal witnesses is supported, more or less, by other witnesses, and each party seems to rely confidently in support of the respective contentions upon other matters which appear in the case, some of which it is necessary to state.

It appears that the defendant was chartered by the State as a street railroad company, and that its chartered powers have never been enlarged. In 1902, a location was surveyed from Presque Isle to Washburn by one Southard, and a map thereof was made. This location was mostly in the highway. It seems to have been legally approved. In 1903, another location was surveyed by one Marston. This location was mainly out of the highway, and avoided

the grades and hills of the highway. It was never approved. No approval was ever asked. No map of it was made. But it followed, with some variations, the general line of the location where the road was afterwards built. Nothing further was done at that time. And matters remained in the same condition until the spring of 1909. The defendant had an approved location within the highway limits, but none without. On July 6, 1909, which was seventeen days after the plaintiff's crew had begun to work, and some time, even according to Murray's testimony, after they had begun to work on the new line, on or near the Marston survey, the defendant filed in the office of the clerk of the county commissioners a copy of the 1902 location in the highway, with a map of the Southard survey thereof. R. S., ch. 53, sect. 7. No map of any other location has ever been filed.

Upon these facts, that the defendant is chartered only as a street railroad company, and that, about the time the work begun, it filed with the county commissioners its approved location in the highway, with map, and has filed no other, the plaintiff bases a strong contention that at the time the contract was made the defendant contemplated building only a street railway in the highway, and not a freight railroad through the fields and woods, and therefore that the contract related only to such a street railway. And of course that is the vital issue in this part of the case.

Inasmuch as on July 6, 1909, the defendant was actually having its roadbed constructed outside of the highway, along the general line of the Marston survey, which was tied to the highway only at certain points, it is difficult to see what was the purpose of filing the Southard highway location with the county commissioners. It was necessary to file that location before commencing construction thereon, but it was not necessary to file it before constructing elsewhere. The case, we think, clearly shows that the defendant was constructing its railroad over land it had purchased or bargained for, and not over land that then had any status as a location. It was taking its chances as to getting an approval from the railroad commissioners afterwards. It had a right to erect a railroad structure on its own land, but it would not have a right to operate it as a railroad without an approval of its location by the railroad commissioners. We cannot help thinking that the place where they

were working July 6, which was out of the highway route, is quite as significant as the filing of the location of the highway route.

Further, as bearing on the claim that the line actually built upon was not the one intended when the contract was made, it appears that though it closely followed the Marston survey, it was not coincident with it. The actual line had not been surveyed through when the work of construction was commenced, but the defendant's engineer's surveyed it along just in advance of the plaintiff's work.

In August following, the defendant petitioned the railroad commissioners for an approval of the route upon which the roadbed was being constructed. The commissioners approved it in part only. And at the northerly, or Washburn end, the defendant was obliged to abandon, for a time at least, some work already constructed, turn its road into the highway, and follow the 1902 location. The plaintiff then objected to going on with the work under the existing agreement, whatever it was. To use Mr. Murray's own language, "The work was so light, comparatively, the yardage was very small, and it was so late in the season, and he wanted us to build a temporary road on the highway, I refused to do that work under any price, considering the location and the time of year." The result was that on October 5, 1909, a supplemental written agreement was made to continue the work on "force account," as it was called, that is, the defendant agreed to pay for grading on a basis of the cost of the same to the plaintiff, plus ten per cent. The supplemental contract also provided for track laying and ballasting, which was not named in the original contract, and for payment therefor on the same basis of cost, plus ten per cent. In the supplemental contract it was agreed that in all respects not modified or varied therein the contract of June 9 should remain in full force and effect.

The defendant, in argument, places great reliance upon these facts, (1) that although the plaintiff claims the original contract was abandoned at the outset as to prices, nevertheless all the payments from month to month until the supplemental contract was made were computed, and were made and received, strictly in accordance with the terms of the first contract; (2) that although when the supplemental contract was made the defendant was owing it, as it now claims, more than $18,000 in excess of what was due

at original contract prices, and although the claim was unadjusted and unsettled, and was based upon an oral agreement merely, no reference was made to this claim in the new contract, and none appears to have been made in the negotiations; (3) that the plaintiff objected, for want of sufficient yardage, to continue the work when they came to the highway, without some new arrangement; and (4) that the plaintiff, in the supplemental contract, recognized, as is contended, that the original contract was in force, and agreed that it should remain so, except as therein modified. As to the first and second of these points nothing further need be said than that they speak for themselves, and are entitled to some consideration. As to the third, it may be observed that the plaintiff does not really claim that the original contract was entirely abrogated and abandoned, but that the location and the provisions for compensation were changed. As to the fourth, it should be said that the plaintiff claims that its reason for objecting to build the roadbed in the highway was that only a temporary structure was contemplated, and therefore that the yardage would be less than normal. On the other hand, it may be suggested that if the plaintiff then understood that it was working under the defendant's agreement to pay what was "right," there would seem to be no good reason why it should have been unwilling to proceed, as it had been proceeding, under that agreement; while if it then understood that it had been working under the contract of June 9, and that that contract referred to the construction of the roadbed through fields and woods where there were cuts and fills, and corresponding yardage, it might with reason object to being transferred to the highway, where necessarily there would be comparatively little yardage.

These are the arguments of the parties based upon the testimony of witnesses, and upon conduct. And without making further special analysis, we may say that if this were all that appeared in the case, we should have grave doubts whether we ought to hold the plaintiff has fairly sustained the burden of proof.

But the defendant contends, and we think justly, that there is internal evidence in the original contract itself that is decisive in its favor. Remembering now that the primary issue is whether that contract was understood by the parties to refer to a railway roadbed constructed along a highway, and necessarily within its limits,

or whether it referred to a roadbed through fields, woods and swamps, and remembering, too, that along the highway there were no woods to clear except a few alders, and no swamps, and that the grubbing was comparatively light and that the highway location was limited to ten feet in width, we will examine the contract.

No fraud or deceit is suggested. . The contract seems to have been fairly entered into by the plaintiff, and we must assume that its contents were known to the plaintiff's officers who authorized its execution. In the first place it makes no reference in terms to either of the disputed locations, nor does it suggest that a street railway,—a railway in the highway,—was contemplated. It mentions only "a first class single track railway" from "Presque Isle to Washburn."

The contract provides "for clearing off all the timber, brush, and stumps, where the line passes through wooded land;" for cutting off "all trees and stumps" close to the ground, or, in some cases, two feet below sub-grade; for constructing cross-ways "in swamps or soft places;" for laying the track "across farm crossings and public highways;" for constructing "farm crossings;" for commencing work "before the fencing is built," and holding the plaintiff responsible for all damage "to crops on adjoining lands;" for "earth cuttings" twenty feet wide; for widening the cuttings when material is required "to make up fills;" for "embankments" fourteen feet wide at sub-grade; for "rock cuttings" twenty feet in width; in rock cuttings for " a water channel" on each side of the roadway "two feet wide and eight inches deep;" "in standard earth cuttings," for a channel on each side "four feet wide and one foot deep;" for "ditches at the side of embankments;" for the excavation of "offtake ditches beyond the limits of the railway grounds," where the drainage could not be conveniently carried off by the side ditches; for "embankments on side hill grounds;" for "stones or boulders found in excavations measuring more than twenty-seven cubic feet;" for the construction of roads "to and from any point on the line of railway for the convenience of the contractor;" for the construction of convenient passing places, wherever the line "is intersected by public or private roads."

These are the only provisions in the contract which throw any light upon the question at issue. And it requires no argument to

show that these are not the description of a roadbed intended to be built within the limits of a highway. The enumeration is sufficient. These provisions are applicable rather to a road built outside of a highway, and sometimes crossing it. And upon a view of the whole case, we are strongly persuaded that the defendant is right in its contention that the contract of June 9 was made with reference to a location substantially where the plaintiff afterwards constructed the roadbed, and that the plaintiff, until the supplemental contract was made was entitled to be paid, only according to the original contract prices.

This disposes of the main controversy. There are however two minor disputes. The plaintiff claims that even if the defendant's contention is sustained on the main question, it is entitled to extra compensation for the erection of "timber in trestles." This claim is based upon the fact, not disputed, that some of the timber furnished by the defendant for this purpose was in some respects unsound, and, having been used in construction elsewhere, had spikes and bolts in it, and was, for these reasons, more expensive to the plaintiff than would have been the case if the timber had been reasonably sound and clear, such as the defendant ought to have furnished to use. This claim is not strenuously resisted. We think it is well founded. But it is almost impossible, from the scanty evidence before us on this question, to determine how much should be allowed. The contract price was $10 a thousand. The amount earned, at contract prices, was $914.97. The plaintiff claims that it should be allowed $15 a thousand, or $1,372.45. That would mean that it took half as long again to do the work as it would have done. The evidence does not support the claim to that extent. We think that an allowance of $200 in excess of the amount due by contract will amply compensate the plaintiff.

The plaintiff claims, further, that it was wrongfully discharged before the completion of the work under the supplemental contract. Under that contract, as already stated, the work was done "on force account." The plaintiff furnished the laborers and charged their wages, plus ten per cent, to the defendant. The wages of common laborers, however, were not to exceed $2 a day. At the time of the alleged discharge, November 29, the plaintiff was paying its laborers the maximum rate of $2. Mr. Gould, the

defendant's president, evidently thought the wages were too high for that season of the year, and wanted to have them reduced. Gould and Michael Murray, plaintiff's manager, (since deceased) had an interview. Curry, plaintiff's book-keeper, was present. Curry testifies that Gould said to Murray, "I want you to stop the work, call your men all in and pay them off tonight. This is the last day. I am all done paying these fancy prices. If there is anybody that wants to work for a dollar and a half a day ——" The witness left the sentence unfinished. On the other hand, Gould testifies that he told Murray that he thought the crew was too large and that he was paying the men too much, that $2 a day for the short days at that season of the year was a little more than he could stand, that the men had hired out in the spring for $1.50 a day, and that he thought the proper thing would be to put them back to $1.50 a day, pick out those that wanted to stay, and pay them by the hour, fifteen cents an hour. And he says that Murray agreed with him in these views, and said he thought the suggestion was good. The next day, however, the plaintiff ceased to work, and now claims that it was discharged. The defendant was able to hire men, including some of the plaintiff's men, at $1.50 a day, and completed the work itself.

We cannot say, upon this evidence, that the plaintiff has sustained the burden of proof. Even taking Curry's version of the interview to be the correct one, it may be doubted whether Murray had reason to understand that Gould intended an absolute discharge. He still left it open to see if men could be hired at $1.50 a day. But there is another view of the question which we think may properly be taken. Although the supplemental contract provided that the wages of common laborers should not exceed $2 a day, that is not to be construed as meaning that the plaintiff under all circumstances was authorized to hire men and pay them $2 a day. Under this contract the plaintiff was bound to use good judgment and to act reasonably and in good faith. It was authorized to pay such wages as were reasonably necessary, but no more, and in no event in excess of $2 a day. To pay more than was reasonably necessary would not only at the best be an exercise of poor judgment, but, in a case like this, where the more that was paid for wages, the larger the amount of the plaintiff's percentages, or profit, would be,

it would be strong evidence of bad faith. Considering the wages the plaintiff was able to hire men for during the summer season, and the wages the defendant was able to hire men for after the plaintiff left the work, and in the absence of evidence to show any material change in conditions making a higher rate of wages necessary, we think the defendant was justified in the complaint its manager made, and that the plaintiff could not complain, and take it as a breach of contract, if the defendant refused to continue to pay unreasonably high wages.

The result is that the plaintiff is entitled to judgment for the $2,136.14 which the defendant admits to be due, and $200 for extra labor on the timber in the trestles, with interest from August 16, 1911, the date of the writ. All other claims are disallowed.

*Judgment for the plaintiff for $2,336.14*
*and interest from August 16, 1911.*